IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SAFETY NATIONAL CASUALTY CORPORATION, | ) ) ) |
| Plaintiff, | ) ) |
| V. | ) ) Case No: 3:09-cv-482-JPG-DGW |
| VILLAGE OF CAHOKIA, | ) ) |
| Defendant/Third-Party Plaintiff, | ) ) |
| V. | ) ) |
| CLAIMSONE, LLC, | ) ) |
| Third-Party Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter comes before the Court on plaintiff Safety National Casualty Corporation's ("Safety National") motion for summary judgment (Doc. 19). Defendant Village of Cahokia ("Cahokia") has responded to the motion (Doc. 24) and has sought to modify its response (Doc. 33). The Court will allow the modification. In this case Safety National seeks a declaration that it is not obligated to pay benefits to Cahokia under an excess workers' compensation insurance policy it issued to Cahokia. It claims Cahokia breached its obligation under the policy to promptly notify Safety National of a workers' compensation claim by former Cahokia employee Robert Wright. Safety National now asks for summary judgment because there is no evidence it was timely notified of the claim.

**I.      Summary Judgment Standard**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396. Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e)(2); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

**II.    Facts**

Viewed in favor of Cahokia, the evidence establishes the following relevant facts.[1]

---

[1] Third-party defendant ClaimsOne has shown some concern that the factual findings made in the order disposing of Safety National's summary judgment motion will be binding on it in connection with litigation of Cahokia's third-party claim. The Court notes that its factual findings in this order are for the purposes of the pending summary judgment motion only, a motion on which ClaimsOne had no opportunity to comment.

    A.    <u>The Policy</u>

Safety National issued an excess insurance policy (No. AGC-4638-IL; the "Policy") to Cahokia to cover Illinois workers' compensation claims that might be made against it for injuries from July 12, 2002, to July 12, 2004. The Policy required a self-insured retention amount of $250,000 per occurrence, that is, Safety National would not be required to pay anything unless the claim exceeded $250,000. Cahokia was solely responsible for paying claims of $250,000 or less. The Policy also contained the following provisions:

> **J. Prompt Reporting of Claims**.
> As soon as the EMPLOYER [Cahokia] becomes aware, the EMPLOYER must provide notice to the CORPORATION [Safety National] of: (a) any claim or action commenced against the EMPLOYER which exceeds, or is likely to exceed, fifty percent (50%) of the Self-Insured Retention Per Occurrence specified in item 7 of the Declarations; . . . and (c) any disability claim, whether or not contested by the EMPLOYER, where it appears reasonably likely that such disability will exceed one year in duration, or where such disability actually exceeds one year in duration.
> * * *
> Failure to render prompt notice of any claim in a manner sufficient to the CORPORATION by the EMPLOYER, or its designated representative(s), may result in the disclaimer of coverage for the particular claim. To constitute prompt, sufficient notice, the EMPLOYER must provide complete information as to the details of the injury, disease, or death.
>
> **K. Defense of Claims**.
> The EMPLOYER shall investigate and settle or defend all claims and shall conduct the defense and appeal of all actions, suits, and proceedings commenced against it. The EMPLOYER shall forward promptly to the CORPORATION copies of any pleadings or reports as may be requested. The CORPORATION shall not be obliged to assume charge of the investigation, defense, appeal, or settlement of any claim, suit, or proceeding brought against the EMPLOYER, but the CORPORATION shall be given the opportunity to investigate, defend, or participate with the EMPLOYER in the investigation and defense of any claim, if, in the opinion of the CORPORATION, its liability under this Agreement might be involved.

At the time Safety National wrote the Policy, Cahokia's workers' compensation claims were administered by Gallagher-Bassett. Later, Cahokia hired insurance agent John Kreisler to try to find a

less expensive third-party claims administrator. On Kreisler's recommendation, in August 2004 Cahokia transferred its claims processing function to ClaimsOne (a third-party defendant in this suit). ClaimsOne took over handling the pending claims that had been previously reported to Gallagher-Bassett, referred to in the industry as "run-in" claims. On August 12, 2004, ClaimsOne informed Kreisler that one of those run-in claims was by Robert Wright.

      B.    <u>Wright's Claim</u>

On April 27, 2003, during the period of the Policy's coverage, Wright injured his back on the job. He stopped working in October 2003 and had back surgery. In March 2004, during Wright's absence from work, Gallagher-Bassett took preliminary steps to ask Safety National whether it would like it to make Wright's claim a "reportable file," in all likelihood because Wright's disability was approaching the one-year mark. There is nothing to suggest the request ever reached Safety National. Wright was able to return to work on April 14, 2005. However, Wright continued to experience back problems and, as a consequence, decided to retire shortly after he returned to work. A few months later, Wright filed a workers' compensation claim asserting a permanent, total disability.

As of May 19, 2005, ClaimsOne assessed Wright's claim at a value of $112,258, which was consistent with Gallagher-Bassett's prior estimation of the claim as in excess of $112,000. However, on August 3, 2005, Wright's attorney wrote ClaimsOne positing that Wright was permanently and totally disabled due to his work injury and demanded a settlement of $379,824.92 to settle the workers' compensation claim. Rod Thompson, the attorney ClaimsOne hired to represent Cahokia, informed ClaimsOne on September 1, 2005, that in light of Wright's settlement demand, "our exposure would be significant in that regard" and that he expected Wright's attorney "to seek a 'premium' with regard to resolution of this case based upon the current information."

By December 2005, ClaimsOne was aware of a vocational expert report indicating that Wright was unable to work at all, and by February 2006, a vocational expert hired by Thompson had reached the same conclusion. On May 9, 2006, Thompson advised ClaimsOne that Cahokia's estimated exposure exceeded $150,000 and suggested that if Cahokia's self-insured retention was $250,000, it should notify Cahokia's excess insurance carrier if it had not already done so.

On June 27, 2006, Wright's claim was presented to an Illinois Industrial Commission arbitrator, and on July 18, 2006, the arbitrator rendered a decision finding Cahokia liable to pay Wright $636.82 per week for the rest of his life. Cahokia did not appeal the ruling by the appeal deadline of August 26, 2006.

    C.    <u>Notice to Safety National</u>

Betty Sharp was Cahokia's finance director and the Cahokia employee responsible for monitoring its workers' compensation claims. Sharp has never had any communication with and has never reported an excess claim to Safety National.

Safety National first learned that it may be liable for part of Wright's claim informally via e-mail on September 22, 2006, and formally via an official claims report on October 1, 2006. There is no evidence that Safety National received any other notification that Wright's claim might exceed 50% of Cahokia's self-retention of $250,000.

    D.    <u>The Litigation</u>

Safety National filed this lawsuit seeking a declaration that Cahokia breached the Policy and that consequently Safety National is not obligated to pay any benefits to Cahokia under the Policy for Wright's claim. It now asks the Court for summary judgment in its favor.

Safety National argues that Cahokia did not abide by ¶ J(b) of the Policy, which requires Cahokia to promptly notify Safety National as soon as it becomes aware a claim may exceed $125,000. Safety

5

National believes that, as a consequence, it owes Cahokia no duty to pay Wright's excess workers' compensation claim. It argues that Cahokia became aware that Wright's claim was reportable at several points. First, Safety National points to Wright's counsel's August 2005 letter explaining Wright was totally and permanently disabled and demanding a settlement of nearly $380,000. Coupled with Thompson's opinion that Cahokia was exposed to significant damages, Safety National argues, the $380,000 demand alerted Cahokia that Wright's claim was likely to exceed $125,000. Second, Safety National argues any inclination to write off Wright's demand letter as "puffing" was negated by the December 2005 and February 2006 opinions by vocational experts, the latter selected by Thompson, that found Wright unemployable. Finally, Safety National points to Thompson's May 9, 2006, recommendation that Cahokia's excess insurance carrier be notified about Wright's claim. The late September/early October 2006 notice was too late and was prejudicial, Safety National argues, especially considering the matter had been tried to a substantial verdict and the appeal period had passed in the interim.

      Cahokia argues that Safety National was given notice of Wright's claim well in advance of the June 27, 2006, arbitration and that, even if the notice was later, it was reasonable because Safety National suffered no prejudice from the delay.

      Alternatively, Safety National argues that Cahokia failed to abide by ¶ J(c) of the Policy, which requires Cahokia to notify Safety National as soon as it becomes aware of "any disability claim, whether or not contested by [Cahokia], where . . . such disability actually exceeds one year in duration." Safety National argues that Wright's disability from October 2003 to April 2005 triggered Cahokia's duty to notify it and that its late September/early October 2006 notice was too late. Cahokia does not address this argument in its response.

**III.     Analysis**

There is no evidence in the record from which a reasonable factfinder could find Safety National had notice of the magnitude of Wright's claim prior to September 22, 2006.  Thus, the Court must determine whether that notice was timely under the Policy considering the facts and circumstances of the case.  The Court concludes it was not.

The Policy required Cahokia to notify Safety National "as soon as [Cahokia] becomes aware. . .of . . . any claim or action . . . which exceeds, or is likely to exceed" $125,000 or "where it appears reasonably likely that such disability will exceed one year in duration, or where such disability actually exceeds one year in duration."  Policy ¶ J(a) & (c).  It further states that the "[f]ailure to render prompt notice" may void the coverage for the particular claim in issue.  Policy ¶ J.  The Court bears in mind that its primary duty when examining the language of an insurance contract is to give effect to the intentions of the parties to the contract as expressed by the language of the contract.  *Country Mutual Ins. Co. v. Livorsi Marine, Inc.*, 856 N.E.2d 338, 342-43 (Ill. 2006).  If the language is unambiguous, the Court must give it its plain, ordinary and popular meaning.  *Id.* at 343.  If it is ambiguous, the language must be construed liberally in favor of the insured.  *Id.*

Notice provisions are standard in insurance contracts, even excess insurance contracts.  Under Illinois law, which governs this controversy, compliance with a notice provision is a valid prerequisite to insurance coverage.  *Country Mutual*, 856 N.E.2d at 343 (citing *Barrington Consol. High Sch. v. American Ins. Co.,* 319 N.E.2d 25, 27 (Ill. 1974)).  This is true even with excess insurance contracts.  *Kerr v. Illinois Cent. R.R. Co.*, 670 N.E.2d 759, 765 (Ill. App. Ct. 1996).  Notice provisions in primary insurance policies ensure than an insurance company has an opportunity to conduct an investigation and gather evidence in a thorough and timely manner.  *Barrington Consol. High Sch.*, 319 N.E.2d at 27.  It is

7

well-established that when a primary insurance policy requires the insured to notify the insurer "as soon as practicable," that phrase is interpreted to mean within a reasonable time. *Country Mutual*, 856 N.E.2d at 343 (citing *Barrington Consol. High Sch.*, 319 N.E.2d at 27).

With respect to excess insurance policies like the one at issue in this case, the excess insurer does not typically need to be notified of an accident or a claim unless it appears likely that the excess insurance will be needed to satisfy the claim. *Hartford Acc. & Indem. Co. v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 595 N.E.2d 1311, 1315 (Ill. App. Ct. 1992). Thus, notice provisions in excess insurance policies typically contemplate the insured's exercising some kind of independent judgment about the value of the case and whether excess coverage will be required. *Id.* In such cases, "the duty to give notice to an excess insurer does not ripen until the insured *reasonably believes it likely* that a claim under the excess insurance policy may be made." *Hartford*, 595 N.E.2d at 1315 (citing *Atlanta Int'l Ins. Co. v. Checker Taxi Co.*, 574 N.E.2d 22, 26 (Ill. App. Ct. 1991)) (emphasis in original). In such cases, the Court must essentially ask "whether the insured abused the discretion granted it by the insurer, *i.e.,* whether the insured acted unreasonably under the circumstances." *Hartford*, 595 N.E.2d at 1316. "[A]ll facts and circumstances bearing on the reasonableness of late notice are appropriate for consideration," *Kerr*, 670 N.E.2d at 765, including whether the insurer was prejudiced by the timing of the notice, *Hartford*, 595 N.E.2d at 1316. Because the Policy clearly relies on Cahokia's discretion to determine when a claim exceeds or is likely to exceed $125,000, the question in this case is when Cahokia reasonably believed it likely that Wright's claim would likely exceed $125,000 and whether it acted reasonably under the circumstances.

The Court need not determine at what precise point Cahokia first became aware of the likelihood Wright's claim would exceed $125,000 because it is clear that by February 2006, a reasonable person in

Cahokia's position would have been aware of that risk and would have notified Safety National. At that time, Cahokia's attorney had received a demand of nearly $380,000 and a report from two vocational experts that Wright was permanently and totally disabled. He was also of the opinion that a "reasonable settlement" was unlikely. Indeed, Thompson's May 9, 2006, e-mail acknowledging liability in excess of $150,000 was based primarily on this report. No significant events had occurred between the February 2006 report and Thompson's May 9, 2006, assessment to change the value of the claim. Giving notice would have been a simple matter, and there was no countervailing reason for Cahokia's failure to do so promptly in or immediately after February 2006.

Safety National was prejudiced by Cahokia's failure to notify it of the claim earlier than September 2006. Although prejudice is not required before a court will find notice untimely, it is one of the factors to be considered. *Hartford*, 595 N.E.2d at 1316. Courts have found that receipt of notice after trial on the underlying claim prejudices the insurer. *See Kerr*, 670 N.E.2d at 767; *Atlanta Int'l Ins. Co. v. Yellow Cab Co.*, 972 F.2d 751, 752 (7th Cir. 1992). Here, Safety National was not notified until after Wright's claim had been conclusively decided in the arbitration proceeding and the appeal period had passed. Safety National was clearly denied "the opportunity to investigate, defend, or participate with [Cahokia] in the investigation and defense" of Wright's claim, a right to which it was entitled under the Policy. Policy ¶ K. Essentially, by the time Safety National knew it was at risk of liability for Wright's claim, there was nothing it could do to protect its interests either through investigating Wright's claim, encouraging settlement, participating in the arbitration or appealing the arbitration award. This is sufficient to establish prejudice from late notice.

Even if Cahokia had not become aware of the potential value of Wright's claim until May 2006, it was similarly unreasonable not to notify Safety National before the arbitration began in June 2006. By

9

May 2006 it was clear that Wright's claim was likely to exceed $125,000 and that time was running short to notify Cahokia's excess insurance carrier. Its attorney had advised notifying the carrier, yet it was not done. There is no reasonable explanation for Cahokia's failure to ensure Safety National was notified before the June 2006 arbitration.

Alternatively, ¶ J(c) of the Policy required notice to Safety National as soon as Wright's disability exceeded one year. Unlike the decision whether Wright's claim was likely to exceed $125,000, determining the length of Wright's disability involved little to no discretion and could be quickly determined by reference to a calendar. Here, this triggering event occurred at the latest in October 2004, a year after Wright left work claiming a temporary, total disability, yet Safety National did not receive notice until nearly two years later and after substantial liability had been established. Perhaps Cahokia thought Wright would be able to return to work before the self-insured retention amount was exhausted and Safety National would never be called on to pay any of Wright's claim. It was wrong, however, and as a consequence, Safety National was deprived of its opportunity to protect its own interests. Cahokia's delay in reporting Wright's extended absence to Safety National was simply unreasonable.

In sum, in light of the specific facts and circumstances of this case, Cahokia acted unreasonably in failing to notify Safety National promptly after it became aware in or before February 2006 or, alternatively, May 2006 of the likelihood that Wright's claim would exceed $125,000 and in failing to notify Safety National in October 2004 that Wright had been disabled for a year. Cahokia breached the Policy by failing to timely notify Safety National of the details of Wright's claim, and, as a consequence, Safety National is not obligated under the Policy to pay any benefits for Wright's claim.

**IV.     Third-Party Claims**

Federal jurisdiction in this case relies on the Court's original diversity jurisdiction over the claim

by Safety National, a citizen of Missouri, against Cahokia, a citizen of Illinois. *See* 28 U.S.C. § 1332(a) (conferring jurisdiction over actions where the matter in controversy exceeds $75,000 and where the controversy is between citizens of different states). Although the Court has resolved Safety National's claim in this case, it continues to have jurisdiction over the remaining third-party claim by Cahokia against ClaimsOne, also a citizen of Illinois, under 28 U.S.C. § 1367(a). That statute extends supplemental federal jurisdiction to all claims that are sufficiently related to the claims on which original jurisdiction is based so as to be part of the same case or controversy.

However, § 1367(c)(3) provides that a district court "may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." In deciding whether to decline jurisdiction over state law claims when no original jurisdiction claims remain pending, a district court should consider judicial economy, convenience, fairness and comity. *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). "[W]hen the district court dismisses all federal claims before trial, the usual and preferred course is to remand the state claims to the state court unless there are countervailing considerations." *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1043 (7th Cir. 1998) (citing *Wright*, 29 F.3d at 1251). The Court will order Cahokia to show cause why its third-party claim should not be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

### V.     Conclusion

For the foregoing reasons, the Court:

- **GRANTS** Cahokia's motion to modify its response (Doc. 33);
- **GRANTS** Safety National's motion for summary judgment (Doc 19);
- **DIRECTS** the Clerk of Court to enter judgment in favor of Safety National at the close of the case declaring:

>Plaintiff Safety National Casualty Corporation has no duty under the insurance policy no. AGC-4638-IL to pay benefits for the workers' compensation claim of Robert Wright; and

- **ORDERS** Cahokia to **SHOW CAUSE** on or before October 1, 2010, why the Court should not dismiss its third-party claim against ClaimsOne without prejudice pursuant to 28 U.S.C. § 1367(c)(3).  ClaimsOne shall have up to and including October 15, 2010, to reply to Cahokia's response.

**IT IS SO ORDERED.**
**DATED:  September 15, 2010**

>s/ J. Phil Gilbert
>**J. PHIL GILBERT**
>**DISTRICT JUDGE**